# Richmond

## A. H. Easley v. First National Bank of Lynchburg, ET AL.

January 9, 1939.

Record No. 2010.

Present, Campbell, C. J., and Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*B. B. Campbell* and *John D. Easley,* for the appellant.

*J. Easley Edmunds, Jr.,* and *Samuel H. Williams,* for the appellees.

EGGLESTON, J., delivered the opinion of the court.

The main question involved in this litigation is whether the First National Bank of Lynchburg has the right to hold as collateral security for the total individual indebtedness of Charles B. Easley to it, certain shares of stock, the property of A. Horsley Easley, which were originally deposited with the bank as collateral security for a loan of $11,000 made by the bank to Charles B. Easley.

The suit was instituted by A. Horsley Easley in the Circuit Court of the city of Lynchburg, and was transferred

to the Circuit Court of Amherst county, where it proceeded until the entry of a final decree adverse to the complainant and from which this appeal has been taken.

The pertinent facts are these: Just prior to October 1, 1923, Charles B. Easley was desirous of purchasing fifty-five shares of stock of the Craddock-Terry Company, which had been offered to him at $200 per share. In order to make this purchase it was necessary that he borrow $11,000. Not having sufficient securities of his own, in addition to the stock to be purchased, to deposit as collateral for the loan, he approached his brother, A. Horsley Easley, who agreed to "see him through" or "help him out" on the loan.

On October 1, 1923, Charles B. Easley, who was then a director in the First National Bank of Lynchburg, called upon E. P. Miller, the president of the bank, asked for a loan of $11,000, explained its purpose, and told Miller of A. Horsley Easley's willingness to furnish the necessary collateral to secure it. Pursuant to a telephone call A. Horsley Easley came to the bank, went to his lockbox in the vault and produced two stock certificates, one for one hundred shares of Norfolk & Western Railway Company common stock, and the other for fifty shares of Northern Pacific Railway Company common stock, each standing in the name of "Andrew H. Easley." He showed these certificates to Miller and was assured that the stocks were of ample value to secure the loan. Thereupon the Norfolk & Western certificate was endorsed in blank in pencil, "A. H. Easley," and the Northern Pacific certificate was endorsed in blank in ink, "'Andrew H. Easley." Both signatures were witnessed in pencil by Charles B. Easley and J. D. Owen, the latter being the cashier of the bank.

Subsequently, in 1930, there was attached to each certificate of stock a blank assignment, each signed in ink, "Andrew H. Easley," and witnessed in ink by an officer of the bank. This was due to the fact that some question had arisen as to the manner in which the certificates had been previously endorsed or witnessed, and is, we think, of no particular significance.

Having endorsed the certificates A. Horsley Easley placed them on Miller's desk, at which both Miller and Charles B. Easley were sitting, and left the bank. Nothing was said by any of the parties at this conference as to what form of note was to be used, how long it should run, or how it should be curtailed. Nothing was said as to whether these stocks might or might not be used to secure any other indebtedness of Charles B. Easley to the bank. Nor does it appear that there was any express understanding between A. Horsley Easley and Charles B. Easley as to any of these matters.

After A. Horsley Easley had left the bank Charles B. Easley signed the usual collateral form of note which had been in use by the bank for some thirty-odd years. We shall later deal with the provisions of this particular note. Suffice it to say for the present that both of the Easley brothers were familiar with its provisions, since they had been frequent borrowers at the bank and had often signed notes containing the identical stipulations.

The original note was dated October 1, 1923, and matured on April 1, 1924. The description of the collateral pledged therewith, namely, the two railway stocks and the fifty-five shares of Craddock-Terry Company stock, was written in the note.

The note was renewed for successive periods of six months and was curtailed from time to time. On April 1, 1925, it had been reduced to $3,500. Thereafter it was continued at this amount until April 1, 1927, when it was consolidated with another note of Charles B. Easley for $2,500, which had been made in October, 1926, and for the payment of which the same collateral had been pledged. There were several renewals of the consolidated note of $6,000, and later the bank loaned Charles B. Easley additional sums. Each time the railway stocks were pledged as security therefor. By October 17, 1936, Charles B. Easley's indebtedness, with accumulated interest, had increased to $23,666.36, represented by a single note for that amount, due on April 7, 1937, and secured by the Norfolk & Western stock, the Northern Pacific stock and other collateral.

During the previous ten or twelve years the Easley brothers had been borrowing considerable sums from the bank, both individually and jointly. At the time of the institution of this suit, in February, 1937, in addition to the above note of Charles B. Easley, the bank held the individual note of A. Horsley Easley for $30,123, and the joint note of the two brothers for $36,217.34. These notes were likewise the result of consolidated loans and were secured by various items of collateral which had been pledged and repledged as the debts increased.

In the meantime, on February 10, 1936, A. Horsley Easley, who was then in Wytheville on business, wrote the president of the bank asking the latter's advice as to making a sale of the "rail stocks I loaned Charlie." The president replied that it was probably advisable to sell these stocks, but that in the event of a sale the proceeds would be applied by the bank first to the payment of Charles B. Easley's personal note of $22,241.55, maturing the following April 7th, and the balance to the joint note of Charles B. Easley and A. Horsley Easley.

To this letter A. Horsley Easley promptly replied, denying the right of the bank to hold said stocks for anything beyond the balance due on the original loan of $11,000. During the succeeding months several letters were exchanged between A. Horsley Easley and the president of the bank, in which each reasserted his position with reference to the bank's holding the collateral as security for the total individual indebtedness of Charles B. Easley.

A. Horsley Easley testified that the president's letter to him of February 11, 1936, was the first intimation he had that the bank was holding his railway stocks to secure any indebtedness of Charles B. Easley other than the balance due on the original loan of $11,000. He further testified that during the intervening period of more than twelve years he had made no inquiry of the bank as to the status of the original loan which the bank had made to his brother, —as to whether the loan had been curtailed or paid, or as

to what had become of his valuable railway stocks which had been deposited as security therefor. According to his further testimony he made no inquiry of his brother as to the status of the loan until December, 1935, when he was told that it had been reduced to $7,000. And this, by the way, was incorrect as the note had been reduced to half that amount.

In December, 1936, A. Horsley Easley wrote the bank offering to pay the balance due on the original note of $11,-000, to secure which the railway stocks had originally been pledged, provided it would return the stocks to him. This offer the bank declined, insisting that it had the right to hold the stocks to secure the entire indebtedness of Charles B. Easley to it.

In the same letter the appellant likewise offered to pay to the bank his individual indebtedness to it, amounting to $30,123, and the joint note of Charles B. Easley and himself to the bank in the sum of $36,217.34, provided the bank would deliver to him (A. Horsley Easley) two hundred and sixty-one shares of stock of Craddock-Terry Company, standing in the name of Charles B. Easley and held by the bank as collateral security for the joint note of the two brothers. This offer the bank likewise refused.

Whereupon A. Horsley Easley filed his bill of complaint against the bank and Charles B. Easley, praying that the bank be required to deliver to him the railway stocks upon his paying the balance due on the original $11,000 note of Charles B. Easley, and that it likewise be required to deliver to him the two hundred and sixty-one shares of Craddock-Terry stock upon his paying the joint note of Charles B. Easley and himself. The complainant likewise prayed that the bank be enjoined from selling or assigning any of the said stocks pending the termination of the litigation.

After the bill had been filed, pursuant to an agreement between the parties, A. Horsley Easley paid to the bank his individual note and the joint note of Charles B. Easley and himself, and received all of the collateral security held by the bank for these notes, except the two hundred and sixty-

one shares of Craddock-Terry stock. It was agreed that the bank was to hold this latter stock and the railway stocks without prejudice to the rights of the parties pending the termination of this suit. Subsequently the Craddock-Terry stock was tendered in court under circumstances to be later discussed.

The bank further agreed that pending the litigation it would not sell or assign the railway and Craddock-Terry stocks, thus obviating the necessity of a restraining order.

After a consideration of the depositions taken on behalf of both parties, the trial court entered a decree sustaining the bank's claim that it had the right to hold the railway stocks as security for the entire individual indebtedness of Charles B. Easley to it.

We are of opinion that the conclusion of the trial court is correct.

It is true that the bank had knowledge of the fact that the railway stocks were the property of A. Horsley Easley, and were being loaned by him to his brother for the purpose of securing a $11,000 loan from the bank. Consequently it acquired possession of the stocks and a lien thereon subject to such limitations as A. Horsley Easley, the owner of the stocks, had placed upon his brother's use of them. 49 C. J., pp. 929, 930, section 67; 7 Am. Jur., p. 452, section 624; *Fischer* v. *Lee,* 98 Va. 159, 35 S. E. 441.

But both of the Easleys testified that A. Horsley Easley placed no restrictions or limitations whatsoever on his brother's right to pledge the stocks. Charles B. Easley testified that he thought that he was acting within his rights when he pledged the stocks for his additional indebtedness to the bank. The president of the bank testified that he thought the bank had the right to accept Charles B. Easley's pledge of the stocks in this manner.

We need not stop to consider whether, under these circumstances and without more, A. Horsley Easley is estopped to deny his brother's use of these stocks to secure the latter's additional indebtedness to the bank. It is clear to us that under these and added circumstances to be related,

the appellant is estopped to claim that his brother had no right to pledge these stocks for any debt other than the original loan of $11,000, or the balance due thereon.

A. Horsley Easley testified that he "understood" that his brother would sign the bank's usual form of collateral note in pledging the stock to secure the original loan; that he (A. Horsley Easley) was familiar with the terms of this note by reason of his past dealings with the bank; and that he likewise knew that the note would be curtailed and renewed from time to time. Consequently his learned counsel quite properly admit in their brief that A. Horsley Easley impliedly authorized the hypothecation of his stocks under and is "bound by the terms and conditions of this particular note" and "any proper renewals thereof."

It is our opinion that under the terms of this note the stocks were pledged to secure all existing and future notes of Charles B. Easley to the bank.

The note was in the following form:

"$..........          Lynchburg, Va.,............193..

".....................days after date for VALUE RECEIVED .... promise to pay to THE FIRST NATIONAL BANK OF LYNCHBURG, Lynchburg, Va., or order at said bank ...................................... DOLLARS with Homestead and all other exemptions waived; having deposited with said Bank, as collateral security for the payment of this note ...............................
..................................................
with the authority to deliver the same to any assignee of this note before maturity, and ...... hereby promise to give at any time, on demand, such additional collaterals as may, from time to time, be required by its President or Cashier. If these additional collaterals be not so given when demanded, then this note to be due; and rebate of interest taken shall be allowed on payment prior to maturity. And ...... hereby give to said Bank, its President or Cashier, full power and authority to sell and assign and deliver or collect the whole or any part of said collaterals

or any substitute therefor, or any additions thereto, at public or private sale, at the option of said Bank, or its President or Cashier or either of them, on the non-performance of the above promises, or of any of them, or at any time thereafter, and without advertising or giving to ...... any notice, or making any demand of payment, and in case of public sale to become the purchaser thereof.

"IT IS ALSO AGREED that said collaterals may, from time to time by mutual consent, be exchanged for others which shall also be held by said Bank on the terms above set forth; and that if ...... shall come under any other liability or enter into any other engagement with said Bank while it is the holder of this obligation, the net proceeds of the sale or collection of the above securities may be applied on this note, and on any other of ...... liabilities or engagements now held by said Bank or hereafter acquired.

"............................"

Appellant's counsel earnestly contend that under the language of the note there was no express pledge of the collateral to secure the payment of any debt other than the original loan of $11,000, or proper renewals thereof; that the note pledged the collateral as security "for the payment of this note" only and not "for the payment of this and any other liability" of the maker, as is customarily provided in collateral notes of this character; and that the right to apply the proceeds of the sale of the securities to any other note was conditioned upon a default in the payment of the note and a sale of the collateral, which never occurred.

No authority is cited to support this argument, nor have we been able to find any.

In *Hallowell* v. *Blackstone Nat. Bank,* 154 Mass. 359, 28 N. E. 281, 13 L. R. A. 315, the court had occasion to construe similar provisions in a collateral note. There the identical argument was presented as is made here. In an opinion by the eminent Justice Holmes, it was held that the agreement constituted "an absolute pledge or mortgage of the securities for other notes and claims."

In *Loyd* v. *Lynchburg Nat. Bank,* 86 Va. 690, 11 S. E. 104, this court reached the same conclusion. In that case A. D. Barnes & Company executed and delivered to the Lynchburg National Bank a note in the sum of $3,700, secured by certain collateral. The language of that note is almost identical with that now before us. The bank likewise held a draft drawn by G. W. Smith on A. D. Barnes & Company, accepted by the latter and discounted by the bank for the benefit of Smith. Barnes & Company failed and the question presented was whether the collateral deposited with the $3,700 note could be held by the bank as security for the draft which it had discounted for the benefit of Smith. This court said (86 Va., at page 694, 11 S. E., at page 105):

"The language, 'if we should come under any other liability, or enter into any other engagement, with said bank, while it is the holder of this obligation,' must be construed to refer to any other liability or engagement of the same kind with the one described in the former part of the contract. This language, while ambiguous, must be construed, in the circumstances of this case, to apply to transactions in which the firm and the bank are the participants and actors."

While it was held that the collateral attached to the note of A. D. Barnes & Company could not be applied to the payment of the firm's draft which the bank had discounted for the benefit of Smith, the language just quoted clearly indicates that the result would have been different if the other note to which the bank sought to apply the collateral had been, as in the instant case, the direct obligation of the maker to the bank.

In construing a similar note in *Norfleet* v. *Pamlico Ins. & Banking Co.,* 160 N. C. 327, 75 S. E. 937, it was held that the bank had a lien on the collateral to secure the payment of other notes signed by the maker as well as that with which the collateral had been pledged. The court based its holding on the reasoning in *Hallowell* v. *Blackstone Nat. Bank, supra.*

While A. Horsley Easley testified that nothing was said to him by any of the officials of the bank to indicate that it

was holding these stocks to secure other indebtedness of Charles B. Easley, we think the record contains conclusive evidence that A. Horsley Easley must have known, during the intervening years from 1923 to 1936, that his brother was pledging these stocks as security for the latter's increasing indebtedness to the bank, and that the bank was holding them as such.

During this same period, as we have seen, A. Horsley Easley was a heavy borrower at the bank, both on his own notes and on the joint notes of Charles B. Easley and himself. To secure these loans he signed collateral notes identical in form with that now under consideration. These were secured by various and numerous items of collateral. Frequently these loans were consolidated and the collateral originally pledged for one note was repledged on consolidated notes. In other words, the bank invariably held the collateral deposited with each note as security for all the other notes of the maker or makers. This was true both of A. Horsley Easley's individual loans and those on which he was jointly liable with his brother. Why should A. Horsley Easley think that the bank was treating the collateral which had been deposited with it by Charles B. Easley in any different manner from that in which it handled the collateral deposited with his own notes? On the contrary, he had every reason to believe that the two borrowers, Charles B. Easley and A. Horsley Easley, were being treated by the bank in the same manner, and that the collaterals deposited by each were being held and treated in the same way. See *Bacon's Adm'r* v. *Bacon's Trustees,* 94 Va. 686, 27 S. E. 576.

The record shows that the relationship between these two brothers was very intimate. Both individually and jointly they were borrowing increasingly large sums from the bank and dealing in stocks. A. Horsley Easley is bound to have known that his brother's individual indebtedness to the bank was increasing, as was his own and their joint liabilities. He testified that during this period Charles B. Easley ran into financial difficulties and could not take care

of his share of their joint indebtedness. He, of course, knew the same was true of Charles B. Easley's individual notes to the bank. Under these circumstances it is inconceivable that A. Horsley Easley did not know that his brother was using the railway stocks to secure his increasing indebtedness to the bank. Certainly he should have known it.

Moreover, in June, 1930, the bank examiner criticized the loans of A. Horsley Easley as being insufficiently secured, and the bank pressed him for a deposit of further collateral. The railway stocks were worth between twenty and thirty thousand dollars, and yet he made no effort to have the bank release to him such part of the collateral as was in excess of an amount necessary to secure the balance due on his brother's original indebtedness. Undoubtedly this was because he believed, if he did not know, that the bank was holding these stocks for Charles B. Easley's entire indebtedness to it.

Therefore, even if A. Horsley Easley did not have actual knowledge that his stocks were being pledged by his brother to secure the latter's total indebtedness to the bank, he at least had every reason to put him on notice that this was being done. And yet he admits that all the while, over a period of twelve years, he stood silently by and said nothing to the bank about any limitation on his brother's right to make such use of the stocks.

Under all of these related circumstances, we are of opinion that A. Horsley Easley is now estopped to deny the bank's right to hold the railway stocks as security for his brother's indebtedness to it.

Neither do we think that the appellant is entitled to damages for the bank's failure to return to him the two hundred and sixty-one shares of Craddock-Terry Company stock. It will be recalled that this stock was the property of Charles B. Easley, and was pledged to secure the joint note of the two brothers to the bank. This note A. Horsley Easley paid on April 14, 1937, pursuant to a written agreement entered into between him and the bank. Under the terms of this agreement the bank was to retain possession

of the two hundred and sixty-one shares of Craddock-Terry stock as well as the railway stocks, pending the outcome of this litigation, the purpose of which was to determine whether the bank had the right to hold all of said stocks for the personal indebtedness of Charles B. Easley to it.

Subsequently, and after the testimony had been taken, Charles B. Easley, the owner of the two hundred and sixty-one shares of Craddock-Terry stock, agreed that it might be delivered to A. Horsley Easley. The bank then tendered the stock in court. Having agreed that the bank might hold the stock pending the outcome of the litigation, A. Horsley Easley is in no position to claim damages for its having done so.

Furthermore, the appellant has acquired possession of the identical Craddock-Terry Company stock which he sought in this suit. There is no proof that he suffered any actual damages by reason of the bank's holding this stock from the date of the payment of the note on April 14, 1937, until the stock was tendered in court on October 2, 1937. See *Virginia Public Service Co.* v. *Steindler,* 166 Va. 686, 187 S. E. 353, 105 A. L. R. 1413.

It is not to be inferred from what we have said that we think that the bank did not have a lien on the two hundred and sixty-one shares of Craddock-Terry Company stock to secure the individual indebtedness of Charles B. Easley. Under the facts stated that question is not presented to us and we express no opinion thereon.

The decree appealed from is

*Affirmed.*

HUDGINS, J., dissenting.

When A. Horsley Easley was called into the conference, held on October 1, 1923, between E. P. Miller, President of the First National Bank of Lynchburg, and Charles B. Easley, the only subject then in the minds of the parties was the security to be offered on a contemplated loan of $11,000

to be used by Charles B. Easley in the purchase of 55 shares of Craddock-Terry Company's stock. A. Horsley Easley went into his lock box in the vault of the bank, took therefrom 100 shares of Norfolk and Western Campany's common stock and 50 shares of Northern Pacific stock, gave it to the officer of the bank, or to Charles B. Easley in the officer's presence, and asked Miller if that was sufficient collateral to secure the one loan. On being assured by Miller that the security was ample, A. Horsley Easley signed the power of attorney in blank, surrendered his stock and left the conference. The contract between the bank and Charles B. Easley was then prepared and executed by the parties in the absence of A. Horsley Easley.

The bank knew that the stock was owned by A. Horsley Easley, and that he had surrendered possession for one purpose only; namely, to secure to the bank the payment of $11,000, a direct obligation of Charles B. Easley. The fact that A. Horsley Easley personally assumed other obligations of his brother, Charles B. Easley, and gave other security for his own obligations to the bank, did not change the original agreement as to the stock.

The doctrine of estoppel is invoked when the rights of an innocent third party are involved. The bank is no innocent third party. It had actual—not constructive—knowledge of the fact that the stock in question was the property of A. Horsley Easley, and had been given to it for one particular purpose. The subsequent conduct of A. Horsley Easley was entirely consistent with that purpose. It reveals that he did not at any time seek to evade the responsibility of the $11,000 obligation. But, when informed of the bank's intention to change the purpose for which the stock had been pledged, by holding it as security for other personal obligations of Charles B. Easley, he promptly registered vigorous objection.

The fact that A. Horsley Easley knew that his brother was not in good financial circumstances and had not fully discharged the $11,000 obligation seems a reasonable explana-

tion of his failure to say anything, prior to February, 1936, to the bank about the stock pledged for the payment of the one loan.

Another reason assigned in the majority opinion for applying the doctrine of estoppel in favor of the bank is that the bank, with A. Horsley Easley's consent, consolidated his different obligations to it, and retained all collateral to secure any and all of his obligations. A complete answer to this is that the collateral held to secure A. Horsley Easley's obligations was his absolute property, and he had executed an agreement for the bank to so deal with his property. The collateral here in question was not the property of Charles B. Easley, the maker of the $11,000 note, but was loaned to him in the presence of the bank official for one purpose. If A. Horsley Easley had repeated this fact every time he saw an official of the bank, it would have gained no additional information.

Before the bank is entitled to invoke the doctrine of estoppel, it is incumbent upon it to prove that it has been misled to its prejudice. "An estoppel is that which prevents one from showing the truth in defense of his rights. Call it by what name we will, it is that which shuts out evidence of the actual truth of the case." *Baker* v. *Preston*, Gilmer (21 Va.) 235, 300. The purpose of the doctrine is to prevent that which deals in duplicity and inconsistency, and to establish some evidence as so conclusive a test of truth that it shall not be gainsaid. Whether legal or equitable, the doctrine should not be extended by construction. *Bower* v. *McCormick*, 23 Gratt. (64 Va.) 310.

In the pertinent cases cited in the majority opinion, the courts were dealing with *bona fide* holders of collateral. The doctrine of estoppel was applied to prevent the true owner from asserting a title to property that, on the strength of his prior act, another had acquired for value, in good faith and without notice. In the case at bar the bank at all times had full notice of A. Horsley Easley's interest in the stock. This fact is established by the testimony of E. P. Miller, an official of the bank. I think that

it would be a breach of good faith and fair dealing, under the circumstances, to permit the bank to retain this stock for any other purpose than that for which it originally acquired it.

For these reasons, I am constrained to dissent from the views expressed in the majority opinion.

CAMPBELL, C. J., concurs in this dissent.